LAW OFFICES OF STEVEN R. FOX
Steven R. Fox, SBN 138808
Daniel Park, SBN 274973
17835 Ventura Blvd., Suite 306
Encino, CA 91316
(818)774-3545; FAX (818)774-3707

Attorneys for Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | CASE NO: 1:14-bk-15360 MT |
| | CHAPTER 11 |
| Oracle Transportation Solutions, Inc., | SECOND MOTION FOR AUTHORITY TO USE CASH COLLATERAL ON AN INTERIM AND FINAL BASIS |
| Debtor. | Date  : February 6, 2015 |
| | Time  : 10:00 a.m. |
| | Place  : Courtroom 302 |
| | Petition filed December 1, 2014 |

TO THE HONORABLE MAUREEN TIGHE, U.S. BANKRUPTCY JUDGE:

COMES NOW the Debtor-in-Possession, Oracle Transportation Solutions, Inc. ("Oracle" or "Debtor") with its "Second Motion for Authority to Use Cash Collateral on an Interim and Final Basis" ("Motion"). [1]

The Debtor seeks authorization to use its monies to operate its business and to do so on a final basis. If the Debtor cannot use its cash collateral, the Debtor would need to cease its business operation. The Debtor is seeking to use cash

---

[1] The Court set February 6th, 2015 as the hearing date and authorized the Debtor to file this Motion by or on January 13, 2015.

1    collateral on a final basis but in the event the Court determines that usage should be

2    pursuant to a budget, the Debtor has attached a proposed budget.

3         Wells Fargo Bank, N.A. ("bank") asserts an interest in the Debtor's monies.

4    For purposes of this Motion only, the Debtor assumes that the bank holds a properly

5    perfected security interests in the Debtor's monies. This may not actually be so.

6         The Debtor operates a trucking business. Many or most of the trucking jobs

7    are farmed out to independent operators or trucking companies. The Debtor may

8    often have on the road up to 40 trucks at a time though it owns a small number of

9    trucks. The number of its jobs daily varies greatly, and the Debtor's budget is based

10    on averages. So actual income and expenses figure will likely greatly vary. The

11    Motion discusses various means for the Debtor to accept additional jobs while not

12    violating the proposed budget.

13         WHEREFORE, the Debtor prays that the Court order the following relief:

14      1.         Enter an order authorizing the Debtor to use cash collateral on an

15              interim basis as per **Exhibit "A"** attached hereto.

16      2.         Grant the various provisions discussed below concerning changes

17              to the budget including the 20% variance, the carry forward

18              provisions, and spending additional income (beyond that forecast)

19              to costs of goods sold (trucking, fuel, insurances, payments and

20              salaries connected to additional trucking jobs not forecast).

21      3.         Set a hearing on final use of cash collateral in the ordinary course

22              of business.

23      4.         Grant to the secured creditors replacement liens in collateral of

24              the estate in the manner discussed in the Motion.

25      5.         Such further relief as the Court deems appropriate.

26

27

28

1    Dated: January 13, 2015          LAW OFFICES OF STEVEN R. FOX

2

3

4                                  Daniel J. Park, counsel for Oracle

5                                  Transportation Solutions, Inc., Debtor-
in- Possession

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2    I.      Introduction and Summary of Relief Requested . . . . . . . . . . . . . . . . . . . . . . .5

3    II.     The Debtor, Its Business, and the Financial Difficulties. . . . . . . . . . . . . . . 5

4    III.    The Debtor Is Taking Significant Steps to Reorganize

5            and Will Continue to Do So During the Chapter 11 Case. . . . . . . . . . . . . 8

6    IV.     Post-Petition Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7    V.      The Debtor's Assets, Income, Expenses and Liabilities. . . . . . . . . . . . . 10

8    VI.     Request for Authority to Use Cash Collateral . . . . . . . . . . . . . . . . . . . . 13

9    VII.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION FOR
## AUTHORITY TO USE CASH COLLATERAL
## ON AN INTERIM AND FINAL BASIS

1. This case was commenced on December 1, 2014, by the filing of a voluntary emergency petition for relief under Chapter 11 of the U. S. Bankruptcy Code. Since then, the Debtor has been, and continues to be, a Debtor-in-Possession. No examiner or trustee has been appointed and no official committee of creditors has been established.

## I.

## Introduction and Summary of Relief Requested

2. The Debtor operates a trucking business. It obtains work from various brokers for shipment of various products and goods throughout the United States. The Debtor and its independent driver/corporations are properly licensed. The Debtor's business model includes security features normally only found with larger companies. Unlike many competitors, the Debtor emphasizes both reliability and customer service. These features and customer service permit the Debtor to charge more for its services than many competitors. The Debtor has also worked to enjoy efficiencies and lower costs than many other trucking companies.

3. LBR 4001-2 (c). There are no stipulations or waivers concerning the use of cash collateral.

4. The Debtor seeks authority to use cash collateral on an interim basis under the budget. Alternatively, the Debtor requests the Court authorize the Debtor to use cash collateral on a final basis and in the ordinary course of business.

## II.

## The Debtor, Its Business, and the Financial Difficulties.

5. The Debtor's business model is a good one. Normally, trucking companies will run five or fewer trucks on the low end or thousands of trucks (on the high

1    end) in order to be profitable.  At the lower end, the operations tend to be

2    mom and pop businesses where costs are kept low as family is doing the work

3    and the costs of a larger business are avoided.  The companies at the higher

4    end operate so many trucks that they have the economy of scale which permits

5    them to deliver a product (trucking jobs) at competitive prices but while

6    permitting the trucking company to eke out a profit.

7    6.    Either through owned trucks or by sending trucking jobs out to independent

8    operators or corporations, Oracle operates in what may be seen as a no-mans

9    land running about 40 trucks.  Oracle is able to do so for various reasons:

10   •       It has been able to obtain lower insurance rates than is typical in

11           the trucking industry for a company of its size.  It has appropriate

12           insurances but has used its connections to help secure

13           advantageous rates.

14   •       The model of farming out many of the trucking hauls (though

15           Oracle also runs its own trucks) permits Oracle to keep a portion

16           of the monies charged for the job but without having to incur the

17           major expenses of owning and operating a truck.

18   •       The company has emphasized reliability and customer service

19           with the brokers and companies who offer the trucking contracts.

20           Some of them will pay more money to induce Oracle to take the

21           trucking contract.  Oracle is known for coming through on its

22           runs.  In the trucking industry, there are many truckers who are

23           not known for their reliability.  Customers will pay more to obtain

24           reliable and secure service.

25   •       The company instituted certain practices which are typical of large

26           trucking companies with many more trucks.  As one example, all

27           trucks are equipped with GPS tracking.  Extra measures are taken

28           for high value cargos including trucks are constantly tracked by

satellite, two drivers will be used, and regular communication with drivers. One goal is to drive at least 300 miles before making the first stop. This helps cut down on the practice of trailing high value cargoes and stealing the cargoes at the first stop.

Most trucking companies running trucks pay commissions to their dispatchers for obtaining work. Though standard practice, to keep costs down, the Debtor does not do so. Instead, dispatchers are on salary. Dispatchers on commissions have an incentive to fill trucks with unprofitable loads. Not paying commissions also solves a common problem where dispatchers underpay independent operators (thereby pushing up their commissions). Underpaying the independent operators leads to high turnover by independent operates.

7.    The Debtor has serious problems it needs to work on while in chapter 11. Here is a short summary:

•    Prepetition, the Debtor was trucking what it understood to be a low value load. The load was stolen and it then turned out the load's value was perhaps $1,000,000. The Debtor's insurance carrier did not cover the loss because the driver was away from the vehicle and the coverage did not cover theft while the driver was away from the vehicle. When a load is identified as a high value load, extra precautions are taken to protect the load. The broker apparently paid the owner of the load and then sued Oracle. The broker, CEVA, obtained a judgment and moved to execute. It levied on approximately $100,000 of Oracle monies shortly before the chapter 11 petition was filed. The loss of that money would be difficult from which to recover.

•    The Debtor has a line of credit with Wells Fargo Bank. When the

CEVA levy hit, Wells Fargo became nervous and prepetition it appeared Wells Fargo transferred the line of credit to its troubled loan department. Post-petition Wells Fargo has acted in ways which have hurt the Debtor's efforts to reorganize.

- The Debtor had an immediate and very serious cash flow problem.

- Another creditor, EZ Mailing Services, Inc., holds a claim for some $286,000. Oracle cannot afford to pay this claim in full.

- The Debtor's management works long hours on a seven day basis. They have been remarkably successful building a company through the Great Recession where before the Debtor's business did not exist. They have obtained high end trucking contracts and have built a reputation for Oracle. Oracle does not have strong financial reporting abilities.

- Management needs guidance and training to increase their sophistication and their abilities to manage and lead the business. During the chapter 11 case, management will get that training.

8.   As a result of these various problems, Oracle sought relief under chapter 11.

9.   The Debtor's business is real. Pictures of the Debtor's office, shop space, and parking spaces are attached as **Exhibit "H."** In the months of November and December, 2014, over 400 loads were picked up and delivered (**Exhibit "F"**). The Debtor has 9 employees. The Debtor entered into multiple lease agreements with owner operators. Copies of the lease agreements are concurrently being filed as a supplement.

III.

**The Debtor Is Taking Steps to Reorganize**

**and Will Continue to Do So During the Chapter 11 Case.**

10.   Despite the problems, the Debtor's prospects are good.

1    • The business is profitable.

2    • The business employs a solid proven business model which draws

3    business to it.

4    • The business had a strong 4th quarter in 2014 and has obtained

5    contracts which it believes will help it have a solid 1st quarter in

6    2015. The first quarter of each year, following the Christmas

7    season, tends to be slow.

8    • The Debtor is working to improve its financial reporting, very

9    quickly. It has employed a CPA.

10    • During the fall, 2014, the Debtor did not have enough drivers to

11    drive its trucks so some trucks were idled. This depressed the

12    Debtor's revenues. Hiring drivers is not an easy matter. The

13    Debtor's customers expect that the Debtor's drivers will have good

14    driving records. This narrows the available pool of people. The

15    Debtor is posting job notices at truck stops, is working through

16    recruiting companies and is offering incentives to current drivers.

17    • Management will improve its skills. For example, management

18    is reviewing receivables from a period of time analyzing which

19    companies pay faster and which are slow pays.

20    11.    Declaration of Richard Say. The attached Declaration of Richard Say discusses

21    in detail the Debtor's financial reporting issues, the changes being made to

22    address the issues, and the improvements being made by the Debtor's

23    management and staff. The declaration also discusses the CPA's observations

24    during a visit to the Debtor's office. The observations illustrate an indicia the

25    Debtor has a real, operating business.

26    IV.

27    Post-Petition Events

28    12.    Post-petition, its operation has exceeded projected revenues. In other words,

1     the Debtor's asset base has increased during the chapter 11 case thus far.

2   13.    The case has been heavily litigated. Wells Fargo has brought motions to terminate use of cash collateral, it is seeking an administrative claim and is seeking relief from the stay. The Debtor has filed oppositions and the bank has replied. Those matters are being heard on January 8, 2015.

6   14.    The bank has acted vigorously for its own reasons, one of which likely is the post-petition overdraft. Post-petition, the Debtor was monitoring its bank accounts at the bank carefully because the bank has a well known policy to freeze the accounts of all debtors who file for bankruptcy relief and who bank with Wells Fargo. So often, monies sit frozen by the bank for long periods of time. That hurts companies. Also, the Debtor was expecting the sheriff to return the levied monies (approx. $97,806.61). The Debtor did not want its monies caught up in the bank's freeze as it needed the levied monies to operate the business. Attached hereto, marked **Exhibit "B,"** and incorporated herein by reference as though set forth in full herein are pictures taken on December 1st, 2nd and 3rd, 2014 showing the balances in the Debtor's bank accounts at the bank. No outstanding checks caused an overdraft. Instead the over draft was caused by the bank not posting accurate balances.

19  15.    The Court granted the Debtor's cash collateral and payroll motions.

20                                   **V.**

21             **The Debtor's Assets, Income, Expenses and Liabilities.**

22   16.    <u>Assets</u>. The Debtor owns approximately 23 trucks and trailers that are being financed. The Debtor owns 4 older trucks that are paid in full. The Debtor also owns some furniture.

25   17.    Here is a summary of the Debtor's primary assets relevant for this Motion:

26      •       Receivables as of December 1, 2014 - $500,610.62.

27              Receivables as of December 31, 2014 - $315,412.15.

28

- Monies on hand as of December 1, 2014 - $113,008.57 (Plus the CEVA levied monies of $97,931.61)

  Monies on hand as of December 31, 2014 - $340,575.28 (Plus the CEVA levied monies of $97,931.61)

- Trucks/Equipment which appear subject to Wells Fargo's security interest with aggregate value of about $442,500 and about $95,567.00 in equity.

18. Since the case's inception the value of assets has increased from $1,154,050.80 to $1,196,419.04. This means the following:

- Assets are not declining in value; and

- The Debtor is not required to make any adequate protection payments.

19. The bank's claim has three components:

- The line of credit for which the bank asserts $579,543.16 is due.

- For a loan to purchase trucks and trailers, $346,933.00 is owed. Payments on the truck loan are current.

- The overdraft which is currently $58,090.25. The Debtor is making a payment of $15,000 in January plus subsequent monthly payments of $5,000.00.

20. Attached hereto, marked **Exhibit "C,"** and incorporated herein by reference as though set forth in full herein is a listing of trucks and trailers the Debtor owns.

21. The bank asserts in its filings that it is under secured. The bank is incorrect.

22. <u>Income and Expenses</u>. The Debtor is attaching selected pages from its year 2011, 2012 and 2013 federal income tax returns reflecting income and expenses for those years. (See **Exhibit "D"**)

23. Year to date gross revenues for year 2014, as of December 2, 2014, was approximately $6,648,250.09. An unaudited report for December states that an additional $589,604.15 in gross revenues were received. Total gross

1    income for year 2014 (unadjusted) was $7,237,854.24.

2   24.   Attached to this Motion marked **Exhibit "E"** and incorporated herein by

3    reference as though set forth in full herein, is an actual to budget report

4    showing projected spending vs. the actual spending through January 9, 2015.

5    It reflects the Debtor spending within the budget and has a net profit.

6   25.   Attached to this Motion marked **Exhibit "F"** and incorporated herein by

7    reference as though set forth in full herein, is the Debtor's load board, a report

8    detailing each of the loads the Debtor picked up and delivered, including

9    dates of pickup and delivery, in the months of November, 2014 and

10    December, 2014. In total, the Debtor delivered over 400 loads during the

11    two-month period. The majority of the loads were obtained at rates higher

12    than the average rate for a similar run. Some rates were lower than the

13    average rate. In total, the gross payout for the loads was $1,453,655.00.

14    The combined payouts under the average rates for those same loads would

15    have grossed $903,920.00. This shows the Debtor is able to consistently

16    obtain rates favorable for its business. The Debtor is able to obtain the

17    favorable rates because of its reputation for reliability. Many companies will

18    pay more money to obtain reliable service. From these loads, the Debtor

19    paid carriers a total of $1,243,025.00 for the loads and netted $211,030.60

20    in brokerage fees from the loads.

21   26.   The bank asserts in its filings that the Debtor is losing money. The bank is

22    incorrect.

23   27.   <u>Secured Claims</u>. The California Secretary of State's records indicate various

24    liens have been filed. Copies of the liens are attached as **Exhibit "G."** For

25    purposes here only, the Debtor assumes that the creditors hold secured

26    interests in monies.

27   28.   <u>Unsecured Claims</u>. Based on available information which will be updated,

28    unsecured claims against the estate amount to approximately $500,000.

# VI.

## Request for Authority to Use Cash Collateral.

29.   The Debtor requires the use of cash collateral in order to operate its business, to pay independent corporations and independent truckers and Oracle's employees, to pay rent and utilities, and to complete existing jobs and to perform future jobs.  Without the use of cash collateral, the Debtor will be unable to remain in business. If the Debtor cannot use the cash collateral, its reputation in the industry will be severely harmed.   Authorizing the relief requested below will benefit the secured creditors as the use of cash collateral will protect their security.  If the secured creditors' liens extend to all of the Debtor's assets, then the Debtor does not have unencumbered sources of monies or other assets to pay ordinary course of business obligations.

30.   Interim Use. The Debtor requests it be authorized to use cash collateral on an interim basis as per the budget.  The budget is based in part on historical financial information and on the Debtor's opinions as to future income and expenses.  The budget is unaudited.  To generate estimates of income, the Debtor's personnel considered current work and its estimation of trucking jobs it will obtain in the near future.

31.   The budget assumes a zero balance for monies on hand.  For the next interim period, the Debtor will be cash flow positive and it will enjoy an estimated net profit of $98.703.62 as of the end of April, 2015.  The Debtor has taken steps to ensure it will have a healthy 1st quarter in 2015 and believes its revenues and expenses for its operations will be consistent with its projections.  Those steps and the reasons for the Debtor's belief are discussed in detail in the attached Declaration of Tigran Gevorgyan.

32.   If the Debtor obtains more jobs than it is forecasting, then it will either need to turn away the work (and not be able to increase the value of the estate's assets) or the Debtor needs to be able to take these jobs despite the budget.

The Debtor proposes that it be permitted to deviate from the budget in the following manners:

- Budget variance as to all expenses items of 20%
- Carryforward all unused expenses from week to week.
- To the extent gross revenues exceed projected gross revenues, the Debtor may use the excess and apply the excess to the costs of handling the additional jobs. This would mean that office payroll would not increase unless additional office staff was needed. Payments to the corporations and/or independent operators would increase. Fuel costs would increase.

33. <u>Variance</u>. If the Debtor determines that it will need to vary from any one budgeted item by more than 20%, the Debtor proposes it provide written notice by email or telecopier of the variance to the secured creditors and if they do not object to the variance within 48 business hours, then the variance will be deemed approved. If the secured creditors objects, then the Debtor will seek to hold a hearing on shortened notice to resolve the dispute.

34. For the period February 2, 2015, through April 26, 2015 the Debtor requests authority to spend $1,334.501.50.

35. <u>The Secured Creditors Are Adequately Protected</u>. Section 361 defines "adequate protection" in various manners including periodic payments to a secured creditor, replacement liens and other relief. The secured creditors are afforded adequate protection of its claim in many ways.

   a. The Debtor believes that during the interim period there will be no diminution in value because the amount of business coming in to the Debtor has been increasing this year. Continued operation of the business protects their claims.

   b. Operating the business maintains value.

   c. All assets are adequately insured.

      d.        The Debtor will make a regular payment to Wells Fargo on the line of credit during this interim period. The budget contains a proposed payment of $2,500.00 monthly to the bank.

36. In previous pleadings filed by the bank, the bank asserted it is not adequately protected. The bank's position is incorrect. First, the bank's assertion of the asset values did not account for the value of the trucks.

37. The value of the Debtor's assets, as of December 31, 2014, is $1,196,419.04.

38. The bank's total claim is $984,566.41 and consists of: (1) the $579,543.16 line of credit; (2) the $346,933.00 loan to purchase trucks and trailers; and (3) the overdraft of $58,090.25 (for which the Debtor is paying $15,000 plus monthly payments of $5,000.00 pursuant to the Court's order).

39. Assuming the Debtor accepts the bank's argument it is a secured creditor for the purposes of this Motion, and believes the bank holds a first position security interest in these assets, there is 21.5% in equity behind the bank's position. The bank is adequately protected.

40. Finally, the value of the asset base is increasing.

41. In addition, the Court ordered, and the Debtor is making, adequate protection payments of $2,500 monthly.

42. <u>Final Use of Cash Collateral</u>. The Court should set a hearing on final use of cash collateral and authorize the Debtor to use cash collateral in the ordinary course of business. Given the difficulties budgeting into the future, because contracts may or may not be awarded to the Debtor and they may start later or sooner than projection, the Debtor requests it be authorized to use cash collateral in the ordinary course of business.

43. <u>Insiders' Compensation</u>. The budget provides for compensation for insiders. They will go through the insider compensation process before being compensated.

44.    <u>Waivers and Cash Collateral Stipulation Form 4001-2; Notice</u>.  There is no stipulation for the use of cash collateral.  There are no provisions in the Motion that are referenced in  Official Form 4001-2.  The Debtor is not here waiving (1) any right to dispute the validity of any liens, (2) to challenge whether particular assets are subject to a tax agencies' security interest, (3) to invalidate a security interest, (4) to surcharge collateral or (5) to maintain any claims that the Debtor may have against the secured creditors.

VII.

**Conclusion.**

WHEREFORE, the Debtor prays that the Court order the following relief:

1.    Enter an order authorizing the Debtor to use cash collateral on an interim basis as per **Exhibit "A."**

2.    Grant the various provisions discussed below concerning changes to the budget including the 20% variance, the carry forward provisions, and spending additional income (beyond that forecast) to costs of goods sold (trucking, fuel, insurances, payments and salaries connected to additional trucking jobs not forecast).

3.    Set a hearing on final use of cash collateral in the ordinary course of business.

4.    Grant to the secured creditors replacement liens in collateral of the estate in the manner discussed in the Motion.

5.    Such further relief as the Court deems appropriate.

Dated: January 13, 2015                LAW OFFICES OF STEVEN R. FOX


Daniel J. Park, proposed counsel for
Oracle Transportation Solutions, Inc.,
Debtor-in- Possession

## DECLARATION OF RICHARD SAY, CPA

I, Richard Say, declare as follows:

1.    I am a certified public accountant. I provide accounting and tax services for business and individuals. I am a partner in Lucove, Say, & Co. (the "firm"). My business address is 23901 Calabasas Road, Suite 2085, Calabasas, CA 91302. My statements here are based on my personal knowledge. If called as a witness, I could and would testify competently concerning the contents in this declaration.

2.    I have over twenty five (25) years of experience working with the accounting needs of small and closely-held businesses. I specialize in financial statement reporting, cash flows, forecasting/budgeting, and general business planning. I have advanced training and substantial continuing education classes in accounting theory and practice as well as real estate and partnership taxation. I am a member of the California Society of Certified Public Accountants and American Institute of Certified Public Accountant.

3.    I am the proposed certified public accountant for the Debtor Oracle Transportation Solutions, Inc. ("Oracle" or "Debtor"). The Application for Authority to Employ Certified Public Accountant for Debtor-in-Possession was filed on December 9, 2014 (Docket No. 30).

4.    The Debtor's Books and Records. At the time I was retained, I received a copy of a set of books, from Quickbooks, which had problems in the way items had been posted. The Debtor was not properly coding expenses.

5.    The Debtor was behind in getting items entered into Quickbooks but not significantly, perhaps 2 to 3 weeks.

6.    Not uncommonly for clients who are not professional accountants, the Debtor was posting payments to Wells Fargo as an expense instead of posting part to principal and the balance to the interest expense so it would show up on the balance sheet. By posting the Wells Fargo payments as an expense, that

1  meant that the liability to Wells Fargo would not show up on the balance

2  sheet.

3  7.  Staff was also not recording payables therefore they did not show up on the

4  balance sheet. They were recording payments on payables as they made the

5  payments. As a result, they would show up as an expense in a P&L.

6  8.  I had one 3.7 hour visit to Oracle's office. There I met with Tigran Gevorgyan,

7  Roman TerOvsepyan, and Ovanes Pogosyan. Other people were working in

8  the office but I met only with those 3 people. Also in early December, 2014,

9  I had a conversation by phone with Ovanes and Roman for about ½ hour.

10  9.  We talked about tracking the trucking jobs on an Excel spreadsheet. They

11  were looking for a way to track all of the expenses, including expenses drivers

12  incur on the job, in Quickbooks but did not know how to do so.

13  10.  I have helped the staff use Quickbooks showing them how to use Quickbooks

14  to track costs by trucking job. As a result, the Debtor is better tracking

15  expenses and doing so more efficiently. Before, they tracked expenses on

16  Excel, causing additional work. Using Quickbooks to track income from a job

17  and its expenses is more efficient. The Debtor's staff can use Quickbooks to

18  see all of the jobs that are out on the road and all of the expenses associated

19  with each of those jobs.

20  11.  The P&L for December, 2014 is still being worked on. To get this P&L done,

21  we are working on reconciling the Tcheck account. This account is a separate

22  account where the Debtor puts money into the account and drivers can then

23  draw monies from the account while they are out on the road to pay for

24  repairs, fuel and other expenses. Those transactions are that which are being

25  recorded along the trucking route so that when the driver returns to Los

26  Angeles for payment, the Debtor can subtract from the payment the expenses

27  which were incurred via Tcheck. That is the last major accounting item which

28  needs to be done before the December P&L is completed.

12. I am also continuing to work on the P&L for the year 2014. To get this done I need to properly classify expenses that were improperly classified. I am doing this work personally and expect to complete it two (2) weeks out. The work is fairly substantial with about 12 to 18 hours of work. There are thousands of transactions for the year. While I can have a bookkeeper work on it, someone with strong experience has to work on it. That person in my office is out with a long term illness so I am doing this work myself. I would consider tasking work to Oracle's staff but I am aware that just doing the daily work and also working on chapter 11 matters makes the staff work full time or more.

13. <u>The Company</u>. Nothing makes me think the company is not real. I did not have an impression the company was not anything other than a trucking company. During my visit, I saw an operating office, people taking phone calls and making phone calls. People were discussing trucking and loads being delivered.

14. I saw what I would normally see at a company. I saw a set of books and loan statements from Wells Fargo to the Debtor for equipment.

15. During my visit to the Debtor's office, we had a general business discussion during the 3.7 hours visit. Later, I had a lengthy phone conversation with Roman TerOvsepyan and Ovanes Pogosyan, again a general business discussion.

16. In my discussions with office staff, we discussed several issues regarding the Debtor's business including, but not limited to:

1.          How to invoice customers and get paid;

2.          How to enter bills for the company's drivers and the independent drivers;

3.          How the company's drivers and the independent drivers should be paid;

4.       We talked about posting transactions for receipts and disbursements;

5.       We talked about tracking jobs and tracing expenses associated with trucking jobs; and

6.       We talked about insurance for trucks.

17. <u>Changes at Oracle since early December</u>. Since early December, the Debtor has made several changes to improve its business and bookkeeping. Listed below is a summary of these changes.

1.       The Debtor's staff has a better understanding of Quickbooks and its capabilities.

2.       The Debtor's staff is using Quickbooks more extensively to track expenses inside Quickbooks.

3.       The Debtor's staff now has a better understanding of the proper treatment and posting of payments.

4.       The Debtor's staff is continuing to improve in the use of Quickbooks, which is their general ledger.

5.       The purchase order system is operating. They were not using it prior to my retention. I helped them set it up. They are using it now.

6.       They are using the Quickbooks program more timely than in the past.

7.       The Debtor is now entering its payables in Quickbooks (before paying the bills) and then paying from the payables report instead of inputting the initial information about the payable at the time they make the payment to the account creditor.

///

///

///

1      I declare under the penalty of perjury under the laws of the United States of

2   America that the foregoing is true and correct.

3      Executed this January 12th, 2015, at Calabasas, California.

4

5

6

7                                              Richard Say, C.P.A.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF TIGRAN GEVORGYAN

I, Tigran Gevorgyan, declare as follows:

1. I am the CEO of Oracle Transportation Solutions, Inc., an active California corporation in good standing. ("Oracle" or "Debtor"). My business address is 6422 Bellingham Avenue, Suite 203, North Hollywood, CA 91606. My statements here are based on my personal knowledge. If called to testify about the contents of my declaration, I could and would testify competently about the contents of this declaration.

2. As the Debtor's CEO, I oversee administrative functions and business operations. I am actively involved in generating income and overseeing the expenses. All business decisions are made through me. I am the person in charge. I have several years of working within the trucking industry. I have worked for the Debtor since its inception. I worked hard to build a company which generates over $6,000,000 annually in gross revenues, in an industry where small companies are known to fail. I built the company from a one truck - one man operation. I made the contacts and relationships which permit the Debtor to obtain higher value loads. I meet these people, brokers, employees of other trucking companies, personnel of companies which have loads to ship and satisfies them about the Debtor's trucking business. I oversee the staff. They look to me to make key spending decisions and operational decisions.

3. Under my leadership, the Debtor does business with some of the largest shippers, brokers and players in the industry. I made most of the contacts and built the relationships. Having these contacts and relationships allows the Debtor opportunities to obtain high value shipments where its rates can be high and profit can be higher than normal.

4. The company is working hard to improve the quality of its financial reports. I have come to learn that they have not been as accurate as I would have liked

1    them to be. At the time of the petition filing, Oracle's financial reporting

2    abilities were not strong. Oracle is working with its new C.P.A. and bringing

3    in new administrative staff to improve its financial reporting quickly. The new

4    C.P.A. and the new staff are working through the Debtor's books. The details

5    discussed below were prepared after personnel worked through the Debtor's

6    financial books and records looking to correct errors.

7   5.    The Debtor operates a trucking business. It obtains work from various brokers

8    for shipment of various products and goods throughout the United States. The

9    Debtor and its independent driver/corporations are properly licensed. The

10    Debtor's business model includes security features normally only found with

11    larger companies. Unlike many competitors, the Debtor emphasizes both

12    reliability and customer service. These features and customer service permit the

13    Debtor to charge more for its services than many competitors. The Debtor has

14    also worked to enjoy efficiencies and lower costs than many other trucking

15    companies.

16   6.    Normally, trucking companies will run five or fewer trucks on the low end or

17    thousands of trucks (on the high end) in order to be profitable. At the lower

18    end, the operations tend to be mom and pop businesses where costs are kept

19    low as family is doing the work and the costs of a larger business are avoided.

20    The companies at the higher end operate so many trucks that they have the

21    economy of scale which permits them to deliver a product (trucking jobs) at

22    competitive prices but while permitting the trucking company to eke out a profit.

23   7.    Either through owned trucks or by sending trucking jobs out to independent

24    operators or corporations, Oracle operates in what may be seen as a no-mans

25    land running about 40 trucks. Oracle is able to do so for various reasons:

26    •    It has been able to obtain lower insurance rates than is typical in

27    the trucking industry for a company of its size. It has appropriate

28    insurances but has used its connections to help secure

advantageous rates.  The Debtor saves on insurance costs as my brother is an insurance agent who writes a lot of insurance for trucking companies.  Because he writes so much trucking insurance, companies are willing to insure the Debtor at rates very good for the Debtor.

- The model of farming out many of the trucking hauls (though Oracle also runs its own trucks) permits Oracle to keep a portion of the monies charged for the job but without having to incur the major expenses of owning and operating a truck.

- The company has emphasized reliability and customer service with the brokers and companies who offer the trucking contracts. Some of them will pay more money to induce Oracle to take the trucking contract.  Oracle is known for coming through on its runs. In the trucking industry, there are many truckers who are not known for their reliability.  Customers will pay more to obtain reliable and secure service.

- The company instituted certain practices which are typical of large trucking companies with many more trucks.  As one example, all trucks are equipped with GPS tracking.  Extra measures are taken for high value cargos including trucks are constantly tracked by satellite, two drivers will be used, and regular communication with drivers.  Drivers also receive instructions on safety precaustion prior to departure.  One goal is to drive at least 300 miles before making the first stop.  This helps cut down on the practice of trailing high value cargoes and stealing the cargoes at the first stop.

- Most trucking companies running trucks pay commissions to their dispatchers for obtaining work.  Though standard practice, to keep

1    costs down, the Debtor does not do so. Instead, dispatchers are

2    on salary. Dispatchers on commissions have an incentive to fill

3    trucks with unprofitable loads. Not paying commissions also

4    solves a common problem where dispatchers underpay

5    independent operators (thereby pushing up their commissions).

6    Underpaying the independent operators leads to high turnover by

7    independent operates.

8    8.    The Debtor has serious problems it needs to work on while in chapter 11. Here

9    is a short summary:

10    •    Prepetition, the Debtor was trucking what it understood to be a low

11    value load. The load was stolen and it then turned out the load's

12    value was perhaps $1,000,000. The Debtor's insurance carrier

13    did not cover the loss because the driver was away from the

14    vehicle and the coverage did not cover theft while the driver was

15    away from the vehicle. When a load is identified as a high value

16    load, extra precautions are taken to protect the load. The broker

17    apparently paid the owner of the load and then sued Oracle. The

18    broker, CEVA, obtained a judgment and moved to execute. It

19    levied on approximately $100,000 of Oracle monies shortly

20    before the chapter 11 petition was filed. The loss of that money

21    would be difficult from which to recover.

22    •    The Debtor has a line of credit with Wells Fargo Bank. When the

23    CEVA levy hit, Wells Fargo became nervous and prepetition it

24    appeared Wells Fargo transferred the line of credit to its troubled

25    loan department. Post-petition Wells Fargo has acted in ways

26    which have hurt the Debtor's efforts to reorganize.

27    •    The Debtor had an immediate and very serious cash flow problem.

28    •    Another creditor, EZ Mailing Services, Inc., holds a claim for some

1      $286,000. Oracle cannot afford to pay this claim in full.

2  •     The Debtor's management, along with me, works long hours on

3      a seven day basis. We have been remarkably successful building

4      a company through the Great Recession where before the Debtor's

5      business did not exist. We have obtained high end trucking

6      contracts and have built a reputation for Oracle. Oracle does not

7      have strong financial reporting abilities.

8  •     Management needs guidance and training to increase their

9      sophistication and their abilities to manage and lead the business.

10      During the chapter 11 case, management will get that training.

11  9.    Despite the problems, the Debtor's prospects are good.

12  •     The business is profitable.

13  •     The business employs a solid proven business model which draws

14      business to it.

15  •     The business had a strong 4th quarter in 2014 and has obtained

16      contracts which it believes will help it have a solid 1st quarter in

17      2015. The first quarter of each year, following the Christmas

18      season, tends to be slow.

19  •     The Debtor is working to improve its financial reporting, very

20      quickly. It has employed a CPA.

21  •     During the fall, 2014, the Debtor did not have enough drivers to

22      drive its trucks so some trucks were idled. This depressed the

23      Debtor's revenues. Hiring drivers is not an easy matter. The

24      Debtor's customers expect that the Debtor's drivers will have good

25      driving records. This narrows the available pool of people. The

26      Debtor is posting job notices at truck stops, is working through

27      recruiting companies and is offering incentives to current drivers

28  •     Management will improve its skills. For example, management is

1    reviewing receivables from a period of time analyzing which
2    companies pay faster and which are slow pays.

3    10.    The case has been heavily litigated.    Wells Fargo has brought motions to
4    terminate use of cash collateral, it is seeking an administrative claim and is
5    seeking relief from the stay.    The Debtor, through its counsel, has filed
6    oppositions and the bank has replied.    Those matters are being heard on
7    January 8, 2015.

8    11.    Post-petition, the Debtor was monitoring its bank accounts.    The Debtor was
9    expecting the sheriff to return the levied monies (approx. $97,806.61).    The
10    Debtor did not want its monies frozen by the bank as it needed the levied
11    monies to operate the business.

12    12.    The Court granted the Debtor's cash collateral and payroll motions.

13    13.    The Debtor requests it be authorized to use cash collateral on an interim basis
14    as per the proposed budget. Attached here as **Exhibit "A"** is a true and correct
15    copy of the Debtor's proposed budget going forward through the end of
16    January, 2015.    Various people including me worked on it.    It is a true and
17    correct copy of what it appears to be. I worked on this projection with staff. As
18    the Debtor's CEO, I am responsible for overseeing the company's income and
19    expenses and its business operations. The report shows projected income and
20    expenses as well as cash flow in the next interim period. It is the Debtor's best
21    estimation going forward for the interim period.

22    14.    The basis for this report, the proposed budget, relies initially on internally
23    maintained financial historical information from 2013, but also on the Debtor's
24    belief as to what income and expenses will be in the near future.    Expenses
25    going forward are estimated on the past 12 months history.    The budget is
26    based in part on the Debtor's.    To generate estimates of income, the Debtor's
27    personnel considered current work and its estimation of trucking jobs it will
28    obtain in the near future.    One major difficulty in estimating income and

expenses is that the Debtor does not know what jobs it will actually obtain in this interim period. It is a growing business and the Debtor anticipates more jobs during this interim period than it for the same time period last year.

15. The months of January and February are generally slow in a given year. The Debtor does not know how much work it will obtain and the number of jobs it obtains bears a direct relationship with certain variable costs, such as fuel expenses and truck repairs.

16. However, based on the growth the Debtor is seeing in its business, I believe there is a good likelihood that there will be more jobs during January, 2015 and February, 2015 than it has had in the past. I base this opinion on the fact that, at the end of 2014, the Debtor was able to obtain contracts for the early months of 2015.

17. I believe the Debtor's revenues and expenses for its operations will be consistent with the projections for a few reasons. First, one basis for my belief is the Debtor's historical performance from the past few years. Second, another basis for my belief is the fact that brokers and shippers are willing to pay above market rates for the Debtor's trucks and services due to its track record of reliability. The Debtor had a great holiday push to close 2014 because customers were willing to pay more to the Debtor because they could count on the jobs getting done correctly and on schedule.

18. Third, historically the better trucking rates have been for loads going out of California going eastward. Beginning in early January, the Debtor noticed a strong movement in the other direction, that is, higher rates being paid on loads from the Midwest going to the east coast and heading back to the Midwest and closer to California. The higher rates are not found at present as much with the California loads. As Oracle is a large enough company to dispatch trucks to other parts of the country and it is not a local shipper dependent on California loads, Oracle has trucks and independent

truckers/corporations stationed in the Midwest so as to pick up these higher paying loads. The trucks are typically moving so expenses are not going to be higher. Also, most truckers tend to stay in their trucks at night as opposed to staying in motels. The Debtor believes that this factor, that the higher paying loads have moved eastward, is one it is taking advantage of and it will not lose revenue or net profit from this move eastward.

19.   The Debtor recognizes that the higher paying loads are in colder parts of the country and so is offering bonuses to the drivers and/or the owner operators to take and to complete those loads. While the bonuses raise the Debtor's costs, the Debtor is able to pass on the costs of the bonuses to the brokers. A typical bonus can typically be a couple of hundred dollars per load. Weather is the reason why the Midwest to east coast loads are the higher paying loads. A lot of truckers won't take those jobs because of the cold. As a result, the cost of shipping goes up and the Debtor can charge more money per load and also pass on the cost of the bonuses.

20.   The Debtor has signed a contract for 17 high paying loads for late January into February with payment in February and March. The 17 high paying loads are at above market rates at about $2.25 per mile. The current market average rate for loads outbound from California is $1.50 per mile. What is being shipped is cacti for CVS and Walgreens. The reason this is paying higher than average is because the Debtor is shipping directly for a customer with whom we have a good, standing relationship. The Debtor is generally able to charge more because the Debtor provides better customer service and the customer trusts the Debtor. The customer could hire elsewhere for less money but the customer wants the job done correctly, on time and with no truckers who might be flaky. The Debtor has a good history with this customer.

21.   The Debtor is seeking a another contract with a broker for a series of shipments of high value loads of clothing. In the trucking industry, loads above $100,000

1   are considered high value loads. Most carriers carry insurance per load of up

2   to $100,000. The Debtor carriers higher coverage, $500,000 and so can

3   carry higher value loads. The Debtor is limiting its bid for the number of

4   shipments, even though the shipping rates will be high because some of the

5   drop off locations will be in areas where shipments are fewer than in other

6   areas.

7   22.   If the Debtor obtains more jobs than it is forecasting, then it will either need to

8         turn away the work (and not be able to increase the value of the estate's assets)

9         or the Debtor needs to be able to take these jobs despite the budget.

10  23.   While expenses such as fuel will vary, the indirect or overhead expenses

11        generally stay consistent. These expenses include rent, staff payroll and payroll

12        taxes, office utilities and insurance.

13  24.   Assets.   The Debtor owns approximately 23 trucks and trailers that are being

14        financed. The Debtor owns 4 older trucks that are paid in full. The Debtor also

15        owns some furniture.

16  25.   Here is a summary of the Debtor's primary assets:

17        •          Receivables as of December 1, 2014 - $500,610.62.

18                   Receivables as of December 31, 2014 - $315,412.15.

19        •          Monies on hand as of December 1, 2014 - $113,008.57

20                   (Plus the CEVA levied monies of $97,931.61)

21                   Monies on hand as of December 31, 2014 - $340,575.28

22                   (Plus the CEVA levied monies of $97,931.61)

23        •          Trucks/Equipment which appear subject to Wells Fargo's security

24                   interest with aggregate value of about $442,500 and about

25                   $95,567.00 in equity.

26  26.   Since the case's inception the value of assets has increased from

27        $1,154,050.80 to $1,196,419.04.

28  27.   The bank's claim has three components:

1      •      The line of credit for which the bank asserts $579,543.16 is due.

2      •      For a loan to purchase trucks and trailers, $346,933.00 is owed.

3                Payments on the truck loan are current.

4      •      The overdraft which is currently $58,090.25

5   28.   Attached hereto, marked **Exhibit "C,"** and incorporated herein by reference as

6         though set forth in full herein is a listing of trucks and trailers the Debtor owns.

7         The report was prepared by the Debtor's staff under my direction. I reviewed

8         the report at the time it was prepared. I asked questions about the assumptions

9         and information in order to ensure its accuracy. I am satisfied the information

10        contained in the report is true and correct.

11   29.   <u>Income and Expenses.</u> Attached hereto, marked **Exhibit "D,"** are selected

12         pages from the Debtor's year 2011, 2012 and 2013 federal income tax returns

13         reflecting income and expenses for those years. I reviewed the tax returns at

14         the time they were prepared. The selected pages included in Exhibit "D" are

15        true and correct copies of the pages from the Debtor's tax returns.

16   30.   Year to date gross revenues for year 2014, as of December 2, 2014, was

17         approximately $6,648,250.09. An unaudited report for December states that

18         an additional $589,604.15 in gross revenues were received. Total gross

19         income for year 2014 (unadjusted) was $7,237,854.24.

20   31.   Attached to this Motion marked **Exhibit "E"** and incorporated herein by

21         reference as though set forth in full herein, is an actual to budget report

22         showing projected spending vs. the actual spending through January 9, 2015.

23         This report was prepared by the Debtor's staff under my direction. I reviewed

24         drafts of the report as they were being prepared. I asked questions to ensure

25         its accuracy. It reflects the Debtor spending within the budget. It also reflects

26        a net profit.

27   32.   Attached as **Exhibit "F"** and incorporated herein by reference as though set

28         forth in full herein, is the Debtor's load board report, a report detailing each

1    of the loads the Debtor picked up and delivered, including dates of pickup and

2    delivery, in the months of November, 2014 and December, 2014.    The

3    information contained in the report is true and correct.  I worked with the

4    Debtor's personnel on the report.    I have personal knowledge of the

5    information contained in the report as I monitor the Debtor's trucking contracts

6    daily, oversee the trucking operations, and I am the individual primarily

7    responsible for booking contracts.  The Debtor is able to consistently obtain

8    rates favorable for its business. The Debtor is able to obtain the favorable rates

9    because of its reputation for reliability.   The column indicating average rates

10    are based on average rates within the industry for each particular load and job.

11    I know the average rates because of my several years of experience in the

12    industry.  I am also on the phone daily negotiating the rates when I book

13    contracts.

14    33.    <u>Secured Claims</u>.  The California Secretary of State's records indicate various

15    liens have been filed.  Copies of the liens are attached here as **Exhibit "G."** For

16    purposes here only, the Debtor assumes that the creditors hold secured

17    interests in monies.

18    34.    <u>Unsecured Claims</u>.  Based on available information which will be updated,

19    unsecured claims against the estate amount to approximately $500,000.

20    35.    As I understand it, a motion to use cash collateral is required when a creditor

21    asserts it is secured by the Debtor's monies and receivables.  Here I believe the

22    secured creditors will assert they hold security interests in the company's

23    monies.  They may or may not be correct.

24    36.    The Debtor requires the use of cash collateral in order to operate its business,

25    to pay independent corporations and independent truckers and Oracle's

26    employees, to pay rent and utilities, and to complete existing jobs and to

27    perform future jobs.  Without the use of cash collateral, the Debtor will be

28    unable to remain in business. If the Debtor cannot use the cash collateral, its

1     reputation in the industry will be severely harmed.  If the secured creditors' liens

2     extend to all of the Debtor's assets, then the Debtor does not have

3     unencumbered sources of monies or other assets to pay ordinary course of

4     business obligations.

5    37.    <u>Interim Use</u>.  The Debtor requests it be authorized to use cash collateral on an

6     interim basis as per the proposed budget (Exhibit "A").

7    38.    The budget assumes a zero balance for monies on hand.  For the next interim

8     period, the Debtor will be cash flow positive and it will enjoy an estimated net

9     profit of $98,703.62 as of the end of April, 2015.

10   39.    If the Debtor obtains more jobs than it is forecasting, then it will either need to

11     turn away the work (and not be able to increase the value of the estate's assets)

12     or the Debtor needs to be able to take these jobs despite the budget.  The

13     Debtor proposes that it be permitted to deviate from the budget in the following

14     manners:

15      •      Budget variance as to all expenses items of 20%

16      •      Carryforward all unused expenses from week to week.

17      •      To the extent gross revenues exceed projected gross revenues, the

18           Debtor may use the excess and apply the excess to the costs of

19           handling the additional jobs.  This would mean that office payroll

20           would not increase unless additional office staff was needed.

21           Payments to the corporations and/or independent operators would

22           increase.  Fuel costs would increase.

23   40.    <u>Variance</u>.  If the Debtor determines that it will need to vary from any one

24     budgeted item by more than 20%, the Debtor proposes it provide written notice

25     by email or telecopier of the variance to the secured creditors and if they do not

26     object to the variance within 48 business hours, then the variance will be

27     deemed approved.  If the secured creditors objects, then the Debtor will seek

28     to hold a hearing on shortened notice to resolve the dispute.

41.  To the extent gross revenues exceed projected gross revenues, the Debtor requests use of the excess and apply the excess to the costs of handling the additional jobs. This would mean that office payroll would not increase unless additional office staff was needed.  Payments to the corporations and/or independent operators would increase.  Fuel costs would increase.

42.  The Debtor believes that during the interim period there will be no diminution in value because the amount of business coming in to the Debtor has been increasing this year.  Also:

    a.        Continued operation of the business protects the bank's claims.

    b.        Operating the business maintains value.

    c.        All assets are adequately insured.

    d.        The Debtor will make a regular payment to Wells Fargo on the line of credit during this interim period.  The budget contains a proposed payment of $2,500 monthly to the bank.

43.  <u>Final Use of Cash Collateral</u>.  The Court should set a hearing on final use of cash collateral and, at that hearing, authorize the Debtor to use cash collateral in the ordinary course of business.  Given the difficulties budgeting into the future, because contracts may or may not be awarded to the Debtor and they may start later or sooner than projection, the Debtor requests it be authorized to use cash collateral in the ordinary course of business.

44.  Attached as **Exhibit "H"** are pictures of the Debtor's offices, the parking areas for the trucks, and the shop where trucks are serviced.  These are recently taken pictures, non-professionally, and I recognize them as pictures of the Debtor's office space, the parking areas for the trucks, and the shop where trucks are serviced.

///

///

///

1      I declare under penalty of perjury under the laws of the United States of

2  America that the foregoing is true and correct.

3          Executed this January 13, 2015, at North Hollywood, CA.

Tigran Gevorgyan

# DECLARATION OF ROMAN TEROVSEPYAN

I, Roman TerOvsepyan, declare as follows:

1.　I am an employee and manager at Oracle Transportation Solutions, Inc., an active California corporation in good standing. ("Oracle" or "Debtor"). My business address is 6422 Bellingham Avenue, Suite 203, North Hollywood, CA 91606. My statements here are based on my personal knowledge or knowledge I have gained either from my duties as an employee for the Debtor or from reviewing the company's business files. If called to testify about the contents of my declaration, I could and would testify competently about the contents of this declaration.

2.　Among my responsibilities at Oracle, I am responsible for overseeing accounting and managing the Debtor's bank accounts. I am primarily responsible for monitoring the company's cash flow and monitoring the bank accounts. I handle the company's bank transactions.

3.　I oversee the safekeeping of the Debtor's banking records. If a banking record is maintained on a computer, there are safety features which help to keep the records secure. For example, access to many records is limited for most employees. Financial records as one example can only be accessed if one has the necessary password. I am the individual who has access to the Debtor's bank accounts. I am an official signatory to the Debtor's bank accounts. I am responsible for maintaining the passwords for logging-in and accessing the Debtor's bank account information online. If there is a need to change any passwords, I am the individual responsible for such changes. On a daily basis, I check the company's bank account balances. If there are deposits or withdrawals that need to be made, I am responsible for traveling to the bank branch and making the withdrawals or deposits. Only management level personnel and I have a necessary password. Other employees do not. The computer is maintained at the place of business. The computer and

1  attachments are maintained at the place of business. Only I have access to the

2  area where this computer is located.

3  4.   I have personal knowledge of the procedures for creating, receiving,

4  maintaining, storing and retrieving banking records. The Debtor's banking

5  records are received, maintained, stored and retrieved in the ordinary course

6  of the company's course of business. It is the ordinary course of the business

7  to receive, maintain, store and retrieve records including any business records

8  attached as exhibits discussed below. I have knowledge of the records and any

9  exhibits contained below because I am one of the individuals responsible for

10 inputting the information into the program. The records were recorded at or

11 near the time of their receipt or creation in the ordinary course of business. The

12 exhibits are what they purport to be.

13 5.   Speaking again to business records, what is accessible to employees on the

14 computer is restricted. We do so for various reasons but this helps to prevent

15 loss of data, or corruption of data. Computer maintenance is performed under

16 my direction and control.

17 6.   The Debtor has 9 employees. Most of the employees are employed as

18 dispatchers for the Debtor's trucking operations.

19 7.   Generally, entities that operate commercial vehicles hauling cargo in interstate

20 commerce must be registered with the FMCSA and must have a USDOT

21 Number. An entity is required to obtain a USDOT number if it owns and

22 operates a vehicle weighing over 10,001 pounds and is involved in interstate

23 commerce. In addition, entities that operate as "for-hire" carriers (carriers for

24 a fee) are generally required to have interstate operating authority (MC

25 Numbers).

26 8.   One exception to the MC Number requirement is that truck owner operators

27 without an MC Number are authorized to enter into lease agreements with an

28 authorized carrier, such as Oracle.

9.    In a typical lease arrangement between an owner operator and an authorized carrier (e.g., Oracle), the owner operator enters into a lease agreement with the authorized carrier and agrees to transport loads for the authorized carrier. Under the agreement, the owner operator owns the truck and leases it to Oracle and is authorized to transport cargo for Oracle under the umbrella of Oracle's MC Number

10.   The Debtor has entered into multiple such lease agreements with owner operators whereby the owner operators agree to transport loads for Oracle. The owner operators lease their trucks to Oracle and operate under Oracle's umbrella. True and correct copies of the lease agreements are attached to the concurrently filed supplement as **Exhibit "I."**  I am the individual at Oracle responsible for overseeing HR and employment issues.  These issues include overseeing the lease arrangements with the owner operator/independent contractors. As such I have personal knowledge of the lease agreements or I have gained knowledge from my review of the lease agreements. I am familiar with the lease agreements, as well as the current status of the agreements.  I supervise and control the records of the lease agreements.   The lease agreements attached to the concurrently filed supplement constitute records taken and/or maintained in the ordinary course of business at or near the time of the act or event to which they relate either by me or the Debtor's personnel, under my direct supervision, and who have a duty to accurately take and maintain such records.  The Debtor's records pertaining to the lease agreements are received, maintained, stored and retrieved in the ordinary course of the company's course of business.  It is the ordinary course of the business to receive, maintain, store and retrieve such records.  What records are accessible to employees is restricted. We do so for various reasons but this helps to prevent loss of data, or corruption of data. I have reviewed the lease agreements attached as Exhibit "I" to the concurrently filed supplement.  The

1    lease agreements attached as Exhibit "I" are true and correct copies of the

2    lease agreements.

3    11.    Attached as **Exhibit "C"** is a chart I prepared with the Debtor's personnel listing

4    all of the Debtor's trucks and equipment and the estimated values of the trucks.

5    Our estimated values are based on research I, along with the Debtor's

6    personnel, conducted in industry trade publications for commercial trucks, and

7    on internet websites the Kelley truck blue book (www.truckbluebook.com), and

8    Commercial Truck Trader (www.commercialtrucktrader.com). The values listed

9    in the chart are our best estimates based on information we found in the

10    publications.

11    12.    For the trucks financed by Wells Fargo, the total estimated value of the trucks

12    is $422,500.  The Debtor owes approximately $346,933 to Wells Fargo on

13    these trucks.

14    13.    Here is a summary of the Debtor's primary assets relevant for this Motion:

15    •        Receivables as of December 1, 2014 - $500,610.62.

16    Receivables as of December 31, 2014 - $315,412.15.

17    •        Monies on hand as of December 1, 2014 -  $113,008.57

18    (Plus the CEVA levied monies of $97,931.61)

19    Monies on hand as of December 31, 2014 - $340,575.28

20    (Plus the CEVA levied monies of $97,931.61)

21    •        Trucks/Equipment which appear subject to Wells Fargo's security

22    interest with aggregate value of about $442,500 and about

23    $95,567.00 in equity.

24    There are two judgments against the Debtor, one held by CEVA, the other by

25    EZ Mailing Services.  The Debtor described the two judgments in its first day

26    filings and attached a copy of the recorded judgment lien in favor of CEVA.

27    14.    The CEVA matter arose out of a job for a long distance haul for a CEVA

28    customer. The Debtor used an independent contractor. In effect, CEVA, acting

1    as a broker, brokered the job to the Debtor who also sub-contracted the job

2    again. The value of the cargo was represented as being low value. As a result,

3    the Debtor did not employ security precautions it (and other companies) uses

4    with higher value cargoes. The cargo was stolen when the sub-contractor left

5    the trailer. The cargo was not recovered. CEVA ultimately sued (or perhaps it

6    was its carrier holding an assignment which sued) and obtained a judgment

7    against the Debtor. The operative facts essentially alleged negligent conduct.

8    15.    EZ sued the Debtor and a broker for lost or stolen cargo. EZ alleged that the

9    driver, while on route, left the cargo unattended and the cargo was stolen.

10    Negligence by the driver was the essential allegation. EZ obtained a judgment

11    against the Debtor.

12    16.    In connection with the Debtor's filing of its emergency voluntary Chapter 11

13    petition on December 1, 2014, I understand the U.S. Trustee guidelines require

14    the Debtor to close prepetition bank accounts and open debtor-in-possession

15    bank accounts. I prepared to close the prepetition bank accounts held at Wells

16    Fargo Bank, N.A. ("Wells Fargo") and I opened post-petition debtor-in-

17    possession bank accounts for the Debtor at California Bank & Trust.

18    17.    Prepetition, CEVA levied $97,806.61 from the Wells Fargo prepetition bank

19    accounts. With respect to the levy, I contacted Wells Fargo's Levy Department.

20    On December 1, 2014, they informed me the levied monies were transferred

21    to the Los Angeles County Sheriff's Department. They also informed me they

22    would not be asserting any of its rights. I checked the accounts at the onset of

23    the chapter 11 case because I understand the bank freezes bank accounts of

24    debtors in Chapter 11 and also the Debtor had made a demand on the Sheriff

25    to return the levied monies.

26    18.    On December 1, 2014, I contacted Los Angeles County Sheriff's Department.

27    After several conversations with the Sheriff's Department, I eventually spoke

28    with Silvia Hernandez and she informed me the monies had not been

processed through the Sheriff's Department's systems. I informed her of the Debtor's bankruptcy filing and demanded the release of the funds and continued monitoring the bank accounts electronically.

19.    As part of my preparation and in accordance with my responsibilities for the Debtor, I monitored the bank account balances at Wells Fargo. When an electronic view of the accounts from the bank's own records reflected a sudden increase of some $100,000 into the accounts, I took it to mean the return of the levied monies. Believing the funds were available, I went to bank branches located at 12160 Victory Boulevard, North Hollywood, CA 91606 and 6348 Sepulveda Blvd, Van Nuys, CA 91411 to make the withdraws. I withdrew monies on December 1, 2014 and December 2, 2014 from the Victory Boulevard branch. On December 3, 2014, at around 10:00 am, I visited the Victory Boulevard branch asking for a cashiers check of all electronic deposits made since the chapter 11 was filed on December 1, 2014 and withdrew the monies. During the visit on December 3, 2014, I had discussions with bank personnel concerning how much could be withdrawn and there were delays in receiving the monies as the bank's personnel figured out what to do. The account was not negative as of December 3, 2014. On December 15, 2014, I spoke to Joe Barizian, the branch manager who directed me to Aimee Johnson, business specialist. Ms Johnson called the Wells Fargo back office Business Department to get authority. She spoke to Sherry Stevens in the support team who informed her they would not be able to write a cashiers check in the requested amount because the account was negative. I was given the Wells Fargo bankruptcy number 503-721-5300.

20.    For each visit, I either checked the available balance information by logging into the bank accounts from my phone or I asked for a transaction receipt showing the funds available in the bank accounts. For each visit, I either checked the available balance information by logging into the bank accounts

1    from my phone or I asked for a transaction receipt showing the funds available

2    in the bank accounts.    Attached and included in **Exhibit "B"** are true and

3    correct copies of transaction receipts for the withdrawal transactions and

4    screenshots of the electronic account balance information as of the time the

5    withdrawals were made.  The receipts included in **Exhibit "B"** are true and

6    correct copies of the receipts that were provided to me upon my request at the

7    bank.  The screenshot images included in **Exhibit "B"** were screenshots I took.

8    The images were automatically saved on my phone.  I transferred the images

9    to my computer at the Debtor's office where they have been maintained in

10   accordance with the security measures described above.  I have not altered or

11   edited the images.  They are what they purport to be.  After withdrawing the

12   monies from the prepetition bank accounts, I deposited the monies into the

13   debtor-in-possession accounts.

14   21.   The accounts at Wells Fargo were used for operating the business and also for

15   receiving electronic payments from customers.    The electronic deposits

16   continued post-petition and may still be continuing to be made.   As a result,

17   even after monies were withdrawn from the account on one day, there would

18   be more monies on hand in the accounts the next day.  There is a constant

19   inflow of customers' electronic transfers into the accounts and when the Debtor

20   made the post-petition withdrawals, it appeared there were excess funds in the

21   account. As of January 12, 2015, the overdraft amount of $80,910 was down

22   to $58,090.25.

23   22.   Attached as **Exhibit "F"** and incorporated herein by reference as though set

24   forth in full herein, is the Debtor's load board report.  The load board report

25   details each of the loads the Debtor picked up and delivered the months of

26   November, 2014 and December, 2014.   The column entitled "Gross Pay"

27   details the gross amount the Debtor received for the load.  The column entitled

28   "Carrier Pay" details the amount the Debtor paid each carrier for the load.  The

"Brokerage" column details the net amount the Debtor received for each load for its brokerage service. The column entitled "Average Rate" details the average rate in the industry for similar loads based on the load size and the distance traveled. Some items are marked "Truck Order Not Used." Sometimes loads are booked but, when the driver goes to pick up the load, the loads end up being cancelled. In these instances, the customer is responsible for paying the Debtor for showing up to pick up the load. For each instance this happened to the Debtor, I marked the instance as "Truck Order Not Used." I prepared the report with the Debtor's management. I have personal knowledge of the information contained in the report as I am responsible for monitoring the Debtor's cash flow, tracking the status of trucking jobs, making payments to carriers when jobs are completed, and maintaining the records of these transactions. I have personal knowledge of the procedures for creating, receiving, maintaining, storing and retrieving records of these transactions. The records of the transactions and details of the transactions are taken in the ordinary course of business at or near the time of the act or event to which they relate either by me or the Debtor's personnel, under my direct supervision, who have a duty to accurately take and maintain such records. The Debtor's records pertaining to the load transactions are received, maintained, stored and retrieved in the ordinary course of the company's course of business. The information contained in the report is true and correct. The exhibit is what it purports to be

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this January __, 2015, at North Hollywood, CA



Roman TerOvsepyan

## DECLARATION OF OVANES POGOSYAN

I, Ovanes Pogosyan, declare as follows:

1.    I am an employee at Oracle Transportation Solutions, Inc., an active California corporation in good standing. ("Oracle" or "Debtor"). My business address is 6422 Bellingham Avenue, Suite 203, North Hollywood, CA 91606. My statements here are based on my personal knowledge or knowledge I have gained either from my duties as an employee for the Debtor or from reviewing the company's business files. If called to testify about the contents of my declaration, I could and would testify competently about the contents of this declaration.

2.    Among my responsibilities at Oracle, my functions include inputting financial information using the Debtor's Quickbooks financial software program, and preparing reports on the financial status of the Debtor for review. My statements here are based on my personal knowledge or knowledge I have gained either from my duties as an employee of the Debtor or from reviewing the company's business files.

3.    I am one of the custodians of the Debtor's books, records, and documents. The Debtor maintains records of its transactions in the regular course of business using Quickbooks financial software, and it is the Debtor's practice and procedure to maintain records and to record transactions, acts, and events at or about the time the transaction occurs. The Debtor relies on these records in connection with its business dealings. I, along with the Debtor's bookkeeper, am responsible for inputting financial information and records of transactions using the Debtor's Quickbooks software. I oversee the safekeeping of business records including financial records. The Debtor has business records primarily as computer files. If a business record is maintained on a computer, there are safety features which help to keep business records secure. For example, access to many records is limited for most employees. Financial records as one

1  example can only be accessed if one has the necessary password.  Only

2  management level personnel and I have a necessary password.  Other

3  employees do not. The computer is linked to a server. The server backs up the

4  data stored on the computer.   The server computer and attachments are

5  maintained at the place of business with limited access to the area where the

6  server is located.

7 4. I have personal knowledge of the procedures for creating, receiving,

8  maintaining, storing and retrieving documents and records.  The Debtor's

9  business records are received, maintained, stored and retrieved in the ordinary

10  course of the company's course of business using the Debtor's Quickbooks

11  software.  It is the ordinary course of the business to receive, maintain, store

12  and retrieve records using the Debtor's Quickbooks software including any

13  business records. I have knowledge of the records discussed below because

14  I am one of the individuals responsible for inputting the information into the

15  Quickbooks program.  The records were recorded at or near the time of their

16  receipt or creation in the ordinary course of business.  Speaking again to

17  business records, what is accessible to employees on the computer is restricted.

18  We do so for various reasons but this helps to prevent loss of data, or

19  corruption of data.

20 5. At the time of the petition filing, Oracle's financial reporting abilities were not

21  strong.   Oracle is working with its new C.P.A. and is bringing in new

22  administrative staff to improve its financial reporting quickly.  The new C.P.A.

23  is working through the Debtor's books. I am helping with the process.

24 6. Attached here as **Exhibit "A"** is a true and correct copy of the Debtor's

25  proposed budget going forward through the end of April, 2015.  I prepared

26  the budget along with the Debtor's management and the Debtor's personnel.

27  It is a true and correct copy of what it appears to be.

28

7. The basis for this report, the proposed budget, relies initially on internally maintained financial historical information from 2013, but also on the Debtor's belief as to what income and expenses will be in the near future. Expenses going forward are estimated on the past 12 months history. The projection was based on hours of discussion and revision by the Debtor's personnel and also with its counsel. Changes were made to actual history based on what the Debtor's likely business would be. The budget was the Debtor's best estimation of income and expenses. To generate estimates of income, the Debtor's personnel considered current work and its estimation of trucking jobs it will obtain in the near future.

8. One major difficulty in estimating income and expenses is that the Debtor does not know what jobs it will actually obtain in this interim period. It is a growing business and the Debtor anticipates more jobs during this interim period than it for the same time period last year. The months of January, 2015 and February, 2015 are generally slow. The Debtor does not know how much work it will obtain and the number of jobs it obtains bears a direct relationship with certain variable costs, such as fuel expenses and truck repairs. However, based on the growth the Debtor is seeing in its business, I believe there is a good likelihood that there will be more jobs during January, 2015 and February, 2015 than it has had in the past because, towards the end of 2014, the Debtor was able to procure several contracts for the beginning months of 2015. If the Debtor obtains more jobs than it is forecasting, then it will either need to turn away the work (and not be able to increase the value of the estate's assets) or the Debtor needs to be able to take these jobs despite the budget.

9. While expenses such as fuel will vary, the indirect or overhead expenses generally stay consistent. These expenses include rent, staff payroll and payroll taxes, office utilities and insurance.

10. Attached as **Exhibit "E"** is a true and correct copy of the Debtor's budget-to-actual report for the three weeks through January 9, 2015. I prepared the budget-to-actual report along with the Debtor's management and the Debtor's personnel. The report was prepared based on transactions the Debtor received from its bank accounts or Tcheck account. The Tcheck account is a separate account where the Debtor puts money into the account and drivers can then draw monies from the account while they are out on the road to pay for repairs, fuel and other expenses. I have reviewed the report. The information contained in the report is true and correct.

11. The Debtor owns approximately 23 trucks and equipment (trailers) that are being financed. The Debtor owns 4 older trucks that are paid in full. The Debtor also owns some furniture.

12. Here is a summary of the Debtor's primary assets:

- Receivables as of December 1, 2014 - $500,610.62.
  Receivables as of December 31, 2014 - $315,412.15.
- Monies on hand as of December 1, 2014 -  $113,008.57
  (Plus the CEVA levied monies of $97,931.61)
  Monies on hand as of December 31, 2014 - $340,575.28
  (Plus the CEVA levied monies of $97,931.61)
- Trucks/Equipment which appear subject to Wells Fargo's security interest with aggregate value of about $442,500 and about $95,567.00 in equity.

13. Since the case's inception the value of assets has increased from $1,154,050.80 to $1,196,419.04.

14. I worked with the Debtor's management and personnel to prepare the report. I have knowledge of the gross revenue and receivables figures discussed above because I am one of the individuals responsible for inputting the information into the Quickbooks program. The records were recorded at or near the time

1       of their receipt or creation in the ordinary course of business.

2   15.     Year to date gross revenues for year 2014, as of December 2, 2014, was

3           approximately $6,648,250.09. An unaudited report for December states that

4           an additional $589,604.15 in gross revenues were received. Total gross

5           income for year 2014 (unadjusted) was $7,237,854.24.

6   16.     The budget to actual report attached as **Exhibit "E"** shows projected spending

7           vs. the actual spending through January 9, 2014. The report reflects the

8           Debtor is spending within the budget. The report also reflects the Debtor is

9           operating at a net profit.

10  17.     In recent years, the Debtor has generated between $6 million to $7 million in

11          gross revenues annually.

12  18.     As of December 1, 2014, the Debtor had $113,008.57 in accounts plus

13          $97,806.61 in levied monies, and receivables approximating $500,610.62.

14  19.     As of December 31, 2014, monies amounted to $340,575.28. This total does

15          not include the $97,806.61 levied by CEVA. Receivables were $315,412.15

16          as of the same date plus the sheriff or the bank is holding the levied monies of

17          $97,806.61.

18  20.     Attached as **Exhibit "C"** is a chart I worked on with the Debtor's personnel

19          listing all of the Debtor's trucks and the estimated values of the trucks. Our

20          estimated values are based on research I, along with the Debtor's personnel,

21          conducted in industry trade publications for commercial trucks, and on internet

22          websites the Kelley truck blue book (www.truckbluebook.com), and Commercial

23          Truck Trader (www.commercialtrucktrader.com). The values listed in the chart

24          are our best estimates based on information we found in the publications.

25  ///

26  ///

27  ///

28  ///

1          I declare under penalty of perjury under the laws of the United States of

2   America that the foregoing is true and correct.

3          Executed this January 12, 2015, at North Hollywood, CA

4

5          _____

6          Ovanes Pogosyan

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**In re**

Oracle Transportation Solutions, Inc.
Debtor(s)

**Chapter 11**
**Case No.: 1:14-bk-15360-MT**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: **17835 Ventura Blvd., Suite 306, Encino, CA 91316**

A true and correct copy of the foregoing document entitled *Second Motion For Authority To Use Cash Collateral On An Interim And Final Basis* will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On *January 13, 2015*, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**On behalf of Wells Fargo:** Marc Andrews sandra.g.mcmasters@wellsfargo.com, **Unknown:** Michael Avanesian michaelavanesian@tilemlaw.com, michaelavanesian@ecf.inforuptcy.com;malissamurguia@tilemlaw.com;joanfidelson@tilemlaw.com;JoanFidelson@ecf.inforuptcy.com, **Trustee:** Katherine Bunker kate.bunker@usdoj.gov, **Counsel for Wells Fargo:** Jennifer Witherell Crastz jcrastz@hemar-rousso.com, **Counsel for Debtor:** Steven R Fox emails@foxlaw.com, **Counsel for Wells Fargo:** J. Alexandra Rhim arhim@hemar-rousso.com, nairy@hemar-rousso.com, **Trustee:** United States Trustee (SV) ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL:**
On *January 13, 2015*, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Honorable Maureen Tighe, U.S. Bankruptcy Court, 21041 Burbank Blvd., Courtroom 302, Woodland Hills, CA 91367, U.S. Trustee, 915 Wilshire Blvd., Suite 1850, Los Angeles, CA 90017

X Service information continued on attached page

**3. SERVED BY ~~PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR~~ EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on *January 13, 2015*, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

X Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 13, 2015 | Sandy Cuevas | |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**Oracle Transportation Solutions, Inc.**
**Ch. 11 Case No. 1:14-bk-15360-MT**
**20 Lgst. Creditors (15):**

Allegiant Partners Incorporated
900 Fourth Street, Suite 200
San Rafael, CA 94901

Capital Partners Funding, LLC
P.O. Box 2766
Carlsbad, CA 92018

CEVA Ground US, LP
c/o Cammarano Law Group
555 East Ocean Blvd., Suite 501
Long Beach, CA 90802

EZ Mailing Services, Inc.
c/o Booth, LLP
1849 Sawtelle Blvd., Suite 500
Los Angeles, CA 90025
**By Email Only:**
**hbooth@boothllp.com**
**iculver@boothllp.com**
**deifert@boothllp.com**

WEX Fleet One
613 Bakertown Rd.
Antioch, TN 37013
*Add. Per POC filed 12/16/14*

GE Transportation Finance
P.O. Box 820024
Philadelphia, PA 19182-0024

GE Transportation Finance
P.O. Box 642222
Pittsburgh, PA 15264-2222

Graystone Partners
6443 SW Beaverton-Hillsdale Hwy.
Suite 205
Portland, OR 97221

Quill Corporation
POB 37600

Philadelphia, PA 19101-0600

State of California
Board of Equalization
P.O. Box 942879
Sacramento, CA 94279-0001

U.S. Bank Equipment Finance
1310 Madrid St.
Marshall, MN 56258

US Bank
8037 Tierneys Woods Curv
Minneapolis, MN 55438

US Bank
P.O. Box 790448
Saint Louis, MO 63179-0448

Wells Fargo
Payment Remittance Center
P.O. Box 54349
Los Angeles, CA 90054-0349

Wells Fargo Bank, N.A.
P.O. Box 8203
Boise, ID 83707-2203

Wells Fargo Bank, N.A.
162 E Main St
Grangeville, ID 83530

~~Wells Fargo Equipment Finance, Inc.~~
~~733 Marquette Avenue., Suite 700~~
~~Minneapolis, MN 55402~~
*Service to counsel by NEF*

~~Wells Fargo Equipment Finance, Inc.~~
~~c/o Corporation Service Company,~~
~~Agen for Service of Process~~
~~2710 Gateway Oaks Dr., Suite 150N~~
~~Sacramento, CA 95833~~
*Service to counsel by NEF*

~~Wells Fargo Line of Credit~~
~~California Business Banking~~
~~MAC U1851-014~~
~~P.O. Box 7666~~
~~Boise, ID 83707-1666~~
*Service to counsel by NEF*